STATE of Wisconsin, Plaintiff-Respondent,

v.

JEANNIE M. P., Defendant-Appellant.

Court of Appeals

*No. 2004AP1445–CR. Submitted on briefs December 16, 2004.
—Decided June 23, 2005.*

2005 WI App 183

(Also reported in 703 N.W.2d 694.)

723

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Michael Yovovich*, assistant state public defender of Madison.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Peggy A. Lautenschlager*, attorney general, and *Jeffrey J. Kassel*, assistant attorney general.

Before Deininger, P.J., Dykman and Higginbotham, JJ.

¶ 1. DEININGER, P.J. Jeannie P. appeals a judgment convicting her of third degree sexual assault. She also appeals an order that denied her postconviction motion for a new trial on the grounds of ineffective assistance of counsel. The defendant contends her trial counsel's performance was deficient in the following regards: (1) he failed to adequately prepare defense witnesses before trial and to call other witnesses having information helpful to the defense; (2) he failed to investigate and present evidence relating to the disputatious divorce pending between the defendant and the alleged victim; (3) he failed to adequately cross-examine a key State witness regarding her animosity toward the defendant and possible motivation to lie. The defendant further contends that the cumulative effect of counsel's deficiencies prejudiced her defense by undermining confidence in the outcome of the trial.

¶ 2. We conclude that trial counsel provided ineffective representation by failing to adduce evidence at trial tending to show that both the alleged victim and the State's principal corroborating witness had motives to lie about the charged incident, and that this failure was prejudicial to the defendant. We therefore reverse the appealed judgment and order, and we remand for further proceedings on the sexual assault charge.

727

## BACKGROUND

¶ 3. The State charged the defendant with burglary and third degree sexual assault based on the following evidence. The defendant's estranged husband, John, claimed that while he and his girlfriend were asleep, the defendant broke into their home and entered the couple's bedroom, where she partially disrobed and mounted John, who was sleeping naked on top of the sheets. John testified that he awoke to find the defendant engaging him in intercourse and ordered her to get off of him. John's girlfriend, Susan, testified that she woke up as this was occurring and observed the defendant doing what John described. John escorted the defendant from the home and called the police a short time later to report the defendant's actions.

¶ 4. A jury acquitted the defendant of burglary but found her guilty of third degree sexual assault. She filed a postconviction motion for a new trial on the grounds that her trial counsel had rendered ineffective assistance, citing the deficiencies we discuss below. After an extensive *Machner*[1] hearing, the trial court denied the defendant's motion for postconviction relief.

¶ 5. The court concluded that, although the defendant's trial counsel was "relatively new," "over his head in some regards" and "overly confident," his strategic choices were reasonable. Having concluded counsel did not perform in a constitutionally deficient manner, the trial court was not required to, and did not, expressly address prejudice. The court said this, however:

> So while I think that it is a case where [defense counsel]'s inexperience did show at times his overall

[1] *State v. Machner*, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

728

performance did not amount to ineffective assistance[,] and even if he did[,] I have no way of knowing based upon this really bizarre series of facts that any other strategy would have either been acceptable or would have resulted in any different jury verdict . . . .

The defendant appeals her conviction and the denial of postconviction relief. We present further details of the trial and postconviction proceedings in the analysis that follows.

## ANALYSIS

¶ 6. In order to demonstrate ineffective assistance of counsel, the defendant must prove that her trial counsel's performance was deficient, and that the deficient performance prejudiced her defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The issues of deficient performance and prejudice constitute mixed questions of law and fact. *See State v. Sanchez*, 201 Wis. 2d 219, 236, 548 N.W.2d 69 (1996). We will not upset findings of fact unless they are clearly erroneous, but whether counsel's performance was deficient or prejudicial are legal questions we decide de novo. *See id.* at 236-37.

### A. Deficient Performance

¶ 7. A lawyer's performance is not deficient unless he or she "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. The constitutional standard is breached if defense counsel's conduct falls below "an objective standard of

reasonableness." *Id.* at 688. Although our review of counsel's performance will be highly deferential to counsel's decisions and actions, we will declare performance deficient if counsel's acts or omissions fall "outside the wide range of professionally competent assistance." *Id.* at 689–90.

¶ 8. We agree with the trial court's conclusions that several of the defendant's asserted deficiencies in her trial counsel's performance were not acts or omissions that could be said to fall below the constitutional standard for effective representation. For example, the defendant complains that defense counsel did not prepare her adequately to testify at trial and permitted her to begin her testimony with a lengthy "narrative" description of her version of what occurred on the night in question. Counsel explained at the *Machner* hearing that he began his examination of the defendant with an open-ended question in order to allow her to tell her story without it appearing to jurors that she was being led or coached by her attorney. He then followed up with specific questions to fill in certain details. The trial court concluded that counsel neither intended to distance himself from the defendant's testimony nor was that the effect produced.[2] As for the issue regarding preparation, counsel testified that he met with the defendant sixteen times prior to trial and spent some nine hours ascertaining her version of events. The trial court concluded that it could not find counsel deficient in his pre-trial preparation of the defendant to testify, nor can we.

---

[2] The trial court concluded that the defendant's testimony "wasn't a narrative. [The defendant] was asked a question and she answered it."

730

¶ 9. We also agree with the trial court's assessment of trial counsel's failure to pursue and present information regarding a number of complaints made to a social services agency regarding the defendant's parenting of her children and a "tip" made to law enforcement that resulted in the defendant's home being searched for evidence of drug trafficking. The defendant believed her husband or his girlfriend Susan were behind these allegedly false reports. Nothing in the record, however, confirms the defendant's suspicions. Even if defense counsel could have succeeded in establishing that one or both of the principal State witnesses were in fact the sources for the reports in question, pursuing the matter at trial might well have backfired on the defense. The door would then arguably have been open for the State to show that the allegations of child abuse or neglect, or of possession of controlled substances, by the defendant were not entirely baseless. We concur with the trial court's assessment that evidence of the allegedly false reports were probably inadmissible at trial, and, even if admitted, the evidence would not have constituted a "free shot" against the State's witnesses:

> There is a whole can of worms which could have been exposed as a result of trying to get into these other things; and while it may appear in [the defendant]'s mind that this is a pattern of conduct which would give [John] an incentive to fabricate, there is certainly a solid strategic reason not to go into it for all of the other things that could be brought up.

¶ 10. Finally, we also agree with the trial court that an overall defense strategy of trying to "keep it simple" by persuading the jury that John's and Susan's

731

version of events bordered on the preposterous and should not be believed was an objectively reasonable strategy. The strategy, as implemented, involved the defendant testifying that she went to John's residence on the night in question, that she agreed to have sexual intercourse with him in return for his agreement to stop "all of the fighting and arguing regarding the children," and that Susan caught them engaged in the consensual act. Because jurors would thus hear competing versions of what had transpired, we conclude that it became incumbent on counsel to present evidence to the jury tending to show that the State's two key witnesses should not be believed.

¶ 11. Put another way, if, as the trial court concluded, defense counsel recognized this case to be a "he-said-she-said" case, counsel should also have recognized the potential impact of the additional "she said" supporting John's account. To implement the chosen defense strategy, counsel should have pursued and presented evidence of reasons that both John and Susan might be lying, if such evidence existed. We conclude from the record of the postconviction proceedings that such impeachment evidence did exist and that counsel was or should have been aware of its existence. Counsel failed, however, to investigate and present the impeaching evidence, either through his cross-examination of the State's witnesses or in the presentation of the defense case. We conclude that, although counsel's overall strategy was reasonable, his implementation of it was not, and that counsel's omissions thus constituted deficient performance.

¶ 12. There is no dispute that John, the alleged victim of the sexual assault, and his girlfriend Susan, the third eyewitness to the events in question, were the State's key witnesses. The defendant took the stand in

her own defense and contradicted John's and Susan's accounts of what transpired when the defendant went to their residence that evening. The outcome of the trial plainly hinged on whose testimony the jury would find more credible, as the State itself succinctly argued in its closing.[3] Any information that would serve to undermine the credibility of the alleged victim and his girlfriend was thus essential to an effective defense. The defendant established at the postconviction hearing the existence of facts that, had they been presented at trial, might have prompted jurors to question John's and Susan's credibility. We conclude that trial counsel's failure to adequately investigate and present those facts constituted deficient performance. *See State v. Thiel*, 2003 WI 111, ¶¶ 46, 50, 264 Wis. 2d 571, 665 N.W.2d 305 (concluding that "it was objectively unreasonable for [defendant]'s counsel not to pursue further evidence to impeach" the alleged victim).

¶ 13. Trial counsel knew that John and the defendant were undergoing a bitter divorce at the time of the alleged sexual assault. Counsel was also aware that John was seeking custody or placement of their two children. The defendant testified at the postconviction hearing that she told her counsel about the problems she was having with John in the divorce relating to placement and child support. Counsel acknowledged at

---

[3] The prosecutor told jurors:

This is a case of somebody lying; and your job then, when going back there to render a verdict, is to figure this out, which side is more credible, which side. Is it John . . . who is telling the truth? Is it Susan . . . who is telling the truth? Is it [the defendant] who is telling the truth? That's what you have to sort out, and for that then you look at other things and other circumstances, look at other evidence that was brought in.

the *Machner* hearing that he spoke with the defendant's divorce attorney but testified that he did not request any documents or other information relating to the divorce.

¶ 14. Although counsel mentioned the divorce proceedings and the child custody dispute briefly in both his opening statement and closing argument, counsel made no effort to admit evidence of the acrimony between John and the defendant over disputed divorce issues during either the defense case or his cross-examination of John. Counsel testified at the *Machner* hearing that he avoided getting into details of the parties' contentious divorce because he feared it would detract from the defendant's claim that she and John had engaged in consensual intercourse. He said that he feared such evidence would raise a question in jurors minds, "Why would parties who hate each other have sex?" We note, however, that the defendant's testimony was not that she had sex with John out of any feelings of love or admiration for him, but in return for his concessions or agreement to lessen the hostilities in the divorce proceedings. Essential to her account, therefore, was some showing that such hostilities arising from the divorce in fact existed.

¶ 15. We conclude, as trial counsel had also apparently concluded at the time of trial, that evidence of John's possible motive for fabricating a sexual assault would have supported, not detracted from, the defendant's version of what occurred.[4] John potentially

---

[4] In his opening statement at trial, defense counsel told jurors: "These two individuals are in the process of getting a divorce and there are conflicting ideas about where the children should stay. [John] wants the children. He wants custody. He wants placement and he wants perhaps even to glean child support from her ultimately." The attorney made these state-

had much to gain from the defendant's conviction for sexual assault, as it would enhance his ability to obtain custody or primary placement of his children, and thereby possibly also relieve him of the obligation to pay the defendant child support. Evidence that John was seeking to have things "his way" in the divorce may also have permitted the defense to argue that John was a controlling person who would stoop to using the divorce issues as leverage to persuade the defendant to submit to his sexual requests. The State was able to argue that John would not make up a sexual assault accusation knowing that he would be subjected to the embarrass-

ments in the context of explaining the defendant's asserted reasons for her visit to John's residence—that he invited her over to discuss the divorce issues. Later in his opening, counsel ascribed several possible motives for John to fabricate his story: "to save himself from being caught cheating, to further his relationship with his girlfriend, perhaps opportunistically seeing a way to wrestle control of the children away . . . ." Likewise, in his closing argument, counsel again told jurors that one reason John might "say all of this happened" was "the fact that they are part of a contested divorce and it is a nasty divorce like they said and the nasty part of it is the custody of the children."

These remarks by counsel at trial show that: (1) counsel was aware of the contested divorce issues at the time of trial; (2) he did not then believe that informing jurors of the contested issues in the divorce was incompatible with his client's defense; and (3) he believed that the pending divorce provided a context that supported his client's version of the events on the evening in question. As we have noted, however, counsel solicited no testimony from either John or the defendant, nor did he present any other evidence, to confirm counsel's description of the contested issues in the divorce and John's possible motive to lie. Jurors were instructed that the "[r]emarks of the attorneys are not evidence. If the remarks suggested certain facts not in evidence, disregard the suggestion." *See, e.g.,* WIS JI—CRIMINAL 157.

735

ment of undergoing a medical examination and of giving public testimony regarding the assault. John's possible motive to provide false testimony against the defendant, however, remained, at best, understated, and, at worst, excluded from the jury's attention.[5]

¶ 16. Perhaps an even more glaring omission was trial counsel's failure to make any effort whatsoever to impeach Susan's testimony corroborating John's account. It is unusual for the State to have the benefit of a third-party eyewitness to an alleged sexual assault. For all jurors knew, Susan and the defendant were relative strangers, and Susan would thus have had no reason to lie about what happened between John and the defendant, save perhaps feelings of jealousy or revenge for the defendant's engaging in sexual relations with her boyfriend. The State discounted the "jealous girlfriend" motive, arguing in closing that, had Susan come upon John having consensual intercourse with the defendant, as the defendant claimed, Susan would not have joined with John in fabricating a sexual assault but would have terminated her relationship with him.

¶ 17. We cannot know, of course, whether jurors accepted the State's proffered rationale for why Susan should be believed, but we do know that they were provided no information whatsoever regarding the confrontations and "bad blood" between Susan and the defendant. As with John's demands and actions in the

---

[5] Counsel's cross-examination of John consisted of less than three transcript pages and focused on the time he went to bed, his and Susan's positioning on the queen-size bed and the location of the doors to his residence. Counsel also elicited John's denial to having telephoned the defendant on the night in question and then terminated his cross-examination.

pending divorce, counsel knew or should have known of the intense animosity between Susan and the defendant and of a threat by Susan to make the defendant's life a "living hell." We conclude that counsel's failure to pursue and present this impeaching evidence was also objectively unreasonable and thus constituted deficient performance.

¶ 18. The defendant testified at the postconviction hearing that she told her counsel about her antagonistic relationship with Susan and the animosity Susan had expressed toward her. She explained that, during a time she was briefly dating Susan's ex-husband, she babysat for Susan's children. Susan's alleged lack of reliability in picking up the children at agreed-upon times led to a conflict between the two women. The defendant told Susan she was no longer welcome at the defendant's home. A witness at the postconviction hearing, who was Susan's boyfriend at the relevant time, testified that Susan told him, soon after this falling out, that she was going to make the defendant's life "a living hell" and she intended to help John get placement of his children. The defendant also introduced a police report at the postconviction hearing showing that the defendant had called the police to complain about Susan's coming to her residence, which resulted in the police contacting Susan about the complaint.

¶ 19. Counsel did not question Susan during cross-examination regarding her adverse relationship with the defendant, her statements that she intended to take revenge against the defendant, her having been contacted by police regarding the defendant's complaint, or any of the past confrontations between the two. The defense cross-examination of Susan consumes less than one page of transcript and consisted entirely of questions that permitted Susan to repeat that she

was sleeping next to John and heard or saw nothing until she awoke to find the defendant astride John. Counsel also had Susan fix her and John's bed time as between "11 and 11:30" and the time of the incident as "between 1 and 1:30." That was the sum total of Susan's cross-examination. Trial counsel testified at the post-conviction hearing that, if he had known about the testimony Susan's former boyfriend gave at the hearing regarding Susan's threats to harm the defendant, he would have "pursued" the information. As we discuss below, however, counsel also acknowledged that he was aware of his client's acrimonious relationship with Susan but failed to pursue it further.

¶ 20. The State contends that, although defense counsel's choice of strategy seems questionable in hindsight, we cannot conclude on that basis alone that trial counsel was ineffective. The State argues that trial counsel's decision to present a consent defense based on the defendant's testimony and the implausibility of the alleged victim's account was reasonable, as was counsel's decision to forgo testimony or cross-examination regarding the contentious divorce action pending between the defendant and her accuser, given the possibility that pursuing these matters might have undermined the consent defense.

¶ 21. We accept the State's contention that the "[r]eview of counsel's performance gives great deference to the attorney and every effort is made to avoid determinations of ineffectiveness based on hindsight .... [T]he burden is placed on the defendant to overcome a strong presumption that counsel acted reasonably within professional norms." *State v. Johnson*, 153 Wis. 2d 121, 127, 449 N.W.2d 845 (1990). We also have no quarrel with the State's assertion that

it was not unreasonable for counsel to present a "consent defense" by offering his client's competing version of events. We conclude, however, that the defendant met her burden to show that counsel unreasonably failed to implement the defense strategy by not pursuing and presenting available evidence to impeach John's and Susan's credibility.

¶ 22. As we have explained, presenting evidence regarding the divorce issues would have complemented the consent defense by supporting the defendant's testimony regarding why she went to John's residence and why she agreed to sexual relations with him, and by providing an answer to the question of why John would make up an assault allegation. As we have also noted (see footnote 4), counsel's opening statement and closing argument support these rationales for presenting evidence regarding the disputed divorce issues. Moreover, a purported strategy of not wanting jurors to believe there was animosity between John and the defendant over divorce issues in no way explains why counsel would not want to establish that animosity existed between Susan and the defendant.

¶ 23. The State, relying on our decision in *State v. Nielsen*, 2001 WI App 192, ¶ 23, 247 Wis. 2d 466, 634 N.W.2d 325, also contends that we cannot deem counsel deficient for failing to discover information that the defendant failed to share with him. We do not doubt that the defendant presented the information regarding the disputed divorce issues and the defendant's past rancorous dealings with Susan with more detail and precision at the postconviction hearing than she communicated to counsel prior to trial. This does not mean, however, that counsel was unaware of the potential existence of the information such that he may be absolved for failing to pursue and obtain it.

¶ 24. The defendant testified at the postconviction hearing that she discussed these matters with her attorney and told him she wanted to testify regarding them, but that counsel told her the divorce disputes with John and her acrimonious relationship with Susan were "not important" to the defense of the criminal charges. Counsel testified, generally, that he did not recall the specifics of what the defendant had told him about these matters. Counsel did admit, however, that the defendant told him that her divorce from John was "not an amicable splitting" and that John was attempting to get custody of the children. Counsel also acknowledged that, although his client gave him the name and phone number of her divorce attorney, whom he called, he did not attempt to obtain any records from the divorce case. Similarly, although counsel denied recalling whether the defendant told him about Susan's specific threats against her, as made to Susan's then-boyfriend, he admitted that he was aware that the two women "didn't like each other" and that the defendant had told him "about certain instances" involving Susan. He gave no explanation or rationale for not pursuing this information or for not cross-examining Susan regarding her attitude about the defendant or their past confrontations.

¶ 25. In sum, we conclude that the defendant has made a sufficient showing that her trial counsel was made aware of the existence of evidence that could be used to impeach the credibility of the State's two key witnesses. We also conclude that counsel's failure to investigate facts that were readily available to him, and his failure to employ those facts at trial to undermine the credibility of the State's two key witnesses by showing their motives to fabricate the assault allegation, constituted representation that fell below an objective standard of reasonableness. As in *Thiel*, 264 Wis.

2d 571, ¶ 46, "[t]he credibility of the complaining witness was paramount to this case," as was the credibility of his girlfriend. And, like the supreme court in *Thiel*, we conclude that, "[u]nder the specific facts of this case, . . . it was objectively unreasonable for . . . counsel not to pursue further evidence to impeach" the alleged victim and his girlfriend. *See id.*, ¶ 50.

## B. Prejudice

¶ 26. Although the defendant has persuaded us that her trial counsel's performance was deficient, this alone does not entitle her to relief. *Strickland*, 466 U.S. at 687. She must also demonstrate that her counsel's errors "were so serious as to deprive [her] of a fair trial, a trial whose result is reliable." *Id*. The defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id*. In assessing prejudice, we cannot consider the deficiency in isolation, rather, we must take into account the totality of the evidence before the trier of fact. *Id*. at 695.

¶ 27. Based on our review of the present record, we conclude that trial counsel's failure to investigate and present at trial facts that would cast doubt on the credibility of the State's principal witnesses undermines our confidence in the verdict. That is, although jurors may have reached a guilty verdict on the sexual assault charge even after hearing about John's desire to gain custody or placement of the children in the divorce proceeding, and about Susan's past confrontations with the defendant and her stated desire to make the

741

defendant's life "a living hell," there is at least a reasonable probability the jury would have acquitted the defendant on both charges she faced instead of just on the burglary charge. Certainty on our part of a different outcome is not required. *See State v. Smith*, 207 Wis. 2d 258, 275, 558 N.W.2d 379 (1997) ("The defendant need only demonstrate to the court that the outcome is suspect, but need not establish that the final result of the proceeding would have been different.").

¶ 28. Only three persons know for sure what happened between the defendant and John on the night in question, and the third supported John's version of events. John's account of being asleep next to Susan and first becoming aware of the defendant's presence when he awoke to find her astride him, engaging him in intercourse, while admittedly not an impossible scenario, was, at a minimum, a highly unusual happening, and one with which jurors might well be skeptical. We conclude that counsel's sole reliance on such skepticism to undermine John's and Susan's credibility, when other evidence could have been marshaled for impeachment purposes, was not only objectively unreasonable but also prejudicial to the defendant. Had jurors heard the additional evidence regarding the relationships and past dealings among the three principals, they might have concluded that John and Susan's version of events was not beyond reasonable doubt.[6]

---

[6] The State contends that jurors acquitted the defendant of burglary because they likely concluded it had not proven she intended to commit the assault at the time she entered John's dwelling, not because they had doubts about the veracity of John's and Susan's testimony. That may well be so, but the question before us is whether, if jurors had been given additional reasons to disbelieve John's and Susan's testimony, there is a reasonable probability that they would have acquitted the

¶ 29. The State asserts that, even if trial counsel had presented evidence casting greater doubt on John's and Susan's veracity, there was sufficient other evidence before the jury to garner a conviction. The State first points to the rebuttal testimony it presented from Susan's seven-year-old daughter. The girl testified that she saw the defendant enter John and Susan's bedroom after hearing the defendant enter the home. A police officer who interviewed Susan's daughter testified that the young girl told her that the defendant had identified herself and told her to go back to sleep. The child also told police that she identified the defendant by the distinctive perfume she wore. The State emphasized the girl's testimony in its closing argument, contending that the defense's theory of a conspiracy between John and Susan to frame the defendant for an assault would have needed to include the seven-year-old daughter as a participant, which the State argued was simply not plausible.

¶ 30. Although the girl's testimony casts doubt on some aspects of the defendant's account (e.g., that she met John outside on the deck and the two of them went to the bedroom together), it does not rule out the defendant's claim of consensual sex. The girl's testimony placed the defendant in John's home at some point on the night in question, and arguably in his bedroom as well. However, the defendant acknowledged on the stand that she had gone to John's residence and engaged in sexual intercourse with him in his bedroom. The girl's testimony and her statements to police, even if believed in their entirety by the jury, does not establish that the defendant committed a sexual assault on the night in question.

---

defendant on the sexual assault charge as well. We conclude that such a reasonable probability exists.

¶ 31. The State next argues that the testimony of Susan's ex-husband severely damaged the defendant's credibility as a witness. Susan's ex-husband testified that the defendant asked him to lie on the stand by testifying that Susan confided to him that John and she had conceived the plan to lure the defendant into having sex with John and have Susan walk in on the couple. According to Susan's ex-husband (who had briefly dated the defendant after separating from Susan), the defendant promised, in exchange for this testimony, to return various of his possessions that still remained at her home. This witness also said that he initially agreed to testify in that fashion because he felt pity for the defendant's situation, but changed his mind after discussing the matter with his mother and a police officer. The State cited this testimony in its closing, arguing to jurors that any conspiracy to frame the defendant would have had to include the ex-husband as well, which rendered a possible conspiracy between John and Susan improbable because such a conspiracy would be far-flung and unwieldy.

¶ 32. We, of course, do not know how significant a role the ex-husband's testimony played in the jury's decision making. He testified to having nine criminal convictions, and he admitted to having lied to the defendant and to her counsel regarding his intended testimony. If jurors believed the essence of his testimony at trial, however, it certainly undermined the defendant's credibility, and, as the State posited, may have tended to show her "consciousness of guilt." Again, however, nothing in the ex-husband's testimony is inconsistent with the defendant's account of a consensual sexual encounter with the alleged victim. It could both be true that (1) the incident occurred in the manner the defendant testified, and (2) she, wrongly, sought to

procure a witness to bolster her chances of having her account accepted by the jury.

¶ 33. Finally, the State argues that evidence of two phone messages that the defendant acknowledged leaving for John on the night of the incident, and her statement to a police officer that she "should have stabbed" John after learning she would be charged for sexually assaulting him, also casts doubt on the defendant's version of events, thereby bolstering John's account. To be sure, the evidence the State cites was not favorable to the defendant, but it is, again, not inconsistent with her innocence. Her warning John in a phone message of "the games she could play," and her statement that she should have stabbed him, are not incompatible with her claim that she submitted to John's offer of concessions in the divorce in return for sex, but soon thereafter came to suspect that John and Susan had duped her and concocted a sexual assault accusation.

¶ 34. In summary, all of the evidence the State cites was, at best, circumstantial and tended to undermine the defendant's credibility. If anything, the cited evidence underscores the detriment to the defendant of her counsel's failure to present jurors with evidence establishing John's and Susan's possible motives for fabricating an assault. The State acknowledged in its closing argument (see footnote 3) that the entire case came down to a credibility contest between the defendant on one side and John and Susan on the other. In order to acquit the defendant of the sexual assault, however, jurors did not have to accept all of the defendant's testimony, they only needed to arrive at a reasonable doubt regarding John's and Susan's testimony. Crucial evidence tending to undermine the credibility of the two key State witnesses was never presented to the jury.

¶ 35. We are thus satisfied that trial counsel's failure to investigate and present evidence of the defendant's divorce-related disputes with John, and of the adversarial relationship and past dealings between the defendant and Susan, constituted deficiencies in representation that prejudiced the defendant. As with our conclusion regarding counsel's performance in this case, the supreme court's discussion in *Thiel* supports our conclusion regarding the prejudicial effect of these failures:

> [T]he proper inquiry for assessing prejudice is not the totality of counsel's performance, but rather the effect of counsel's acts or omissions on the reliability of the trial's outcome. The key question ... is whether the evidence that was omitted or not made fully available to the jury due to the deficiencies in counsel's performance undermined confidence in the outcome of the case, given the totality of the evidence that was adduced at his trial. We conclude that it has.

*Thiel*, 264 Wis. 2d 571, ¶ 80 (citation omitted). Accordingly, we conclude that the defendant is entitled to a new trial on the charge of third degree sexual assault.

## CONCLUSION

¶ 36. For the reasons discussed above we reverse the appealed order and judgment of conviction. We remand to the circuit court for further proceedings on the charge of third degree sexual assault.

*By the Court.*—Judgment and order reversed and cause remanded.