COURT OF APPEALS
DECISION
DATED AND FILED

October 6, 2020

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

**This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.**

**A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals.** *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No. 2018AP2325-CR**

**STATE OF WISCONSIN**

Cir. Ct. No. 2014CF2442

**IN COURT OF APPEALS
DISTRICT I**

STATE OF WISCONSIN,

       PLAINTIFF-RESPONDENT,

  V.

PEDRO R. MENDOZA, III,

       DEFENDANT-APPELLANT.

APPEAL from a judgment of the circuit court for Milwaukee County: THOMAS J. McADAMS, Judge. *Reversed and cause remanded with directions.*

Before Brash, P.J., Donald and White, JJ.

¶1 DONALD, J. Pedro R. Mendoza, III, appeals the judgment of conviction, following a jury trial, of one count of first-degree recklessly endangering safety with the use of a dangerous weapon, and one count of

endangering safety with the use of a dangerous weapon. Mendoza contends that he did not receive the effective assistance of counsel. Because we agree, we reverse the judgment of conviction. Accordingly, we remand the matter for a new trial.

## BACKGROUND

¶2 On June 12, 2014, Mendoza was charged with one count of first-degree recklessly endangering safety with the use of a dangerous weapon and one count of endangering safety with the use of a dangerous weapon. According to the criminal complaint, the charges stemmed from a shooting that took place on May 4, 2014, in the area of 3102 West Lincoln Avenue, Milwaukee. The complaint states that Mendoza shot a firearm into the vehicle of H.V. and M.M.C. When police responded to a shots fired complaint, they ultimately encountered H.V., who was bleeding. H.V. told police that he knew the shooter, but was afraid to identify him. Later that day, however, Mendoza turned himself in to Milwaukee Police and turned in the firearm used in the shooting. Mendoza told police that he heard shots fired and fired his firearm in return. Mendoza later told police that H.V. fired at him and that Mendoza returned the fire.

¶3 Prior to trial, the State filed a motion to admit other-acts evidence of Mendoza's and H.V.'s affiliation with the Latin Kings gang. The State argued that the evidence was relevant to Mendoza's motive and identity. Specifically, the State argued that Mendoza shot H.V. as revenge for H.V.'s cooperation with police leading to a federal indictment "of the Latin King Criminal enterprise[.]" The State also argued that expert testimony about the "existence of the Latin Kings and their method of operation" would assist the jury in understanding the evidence. Mendoza opposed the motion, stating that the State's theory was

2

completely speculative and, contrary to the State's representation, Mendoza was never prosecuted for any activities related to the Latin Kings.

¶4     Multiple hearings were held prior to trial; however, the trial court did not make a ruling on the issue.  Rather, on the first day of trial, the State raised the issue of Mendoza's history with the Latin Kings during voir dire with no objection from trial counsel.  Specifically, the State told the jury pool that the victim and Mendoza "have an affiliation with the Latin Kings street gang and that there are witnesses who are going to be afraid to be here."  The State further asked if "anyone in the group" had "concerns about the fact that we may be hearing from some dangerous people[.]"  One member of the jury pool spoke up, saying "Just the fact that, you know, when you announce here where you live, your names, your family members, and then you're talking about street gangs so obviously then it's common knowledge."  The State asked whether any other jurors shared the same concern, some of the jurors nodded.  Shortly thereafter, the State again told the potential jurors that some of the witnesses were "concerned about their safety and what's going to happen," and asked whether the jurors understood the witnesses' concerns.  The jurors nodded.  Trial counsel did not object to any of the State's statements during voir dire, but told the jury that "the affiliation that was referred to in terms of gang relationship [was] more than 20 years ago[.]"

¶5     Multiple witnesses testified at trial, including Sergeant Rebecca Carpenter, M.M.C., H.V., S.H. (Mendoza's then-girlfriend), Officer Keith Miller, Detective Jason Enk, and Mendoza.

¶6     Sergeant Carpenter testified that at or around 1:10 a.m. on the morning of May 4, 2014, she was patrolling the area of South 35th Street and Lincoln Avenue when she noticed a driver gesturing in his vehicle.  Carpenter

testified that she "moved to come up behind him," but that the driver drove off. Carpenter noticed that part of the window on the driver's door was missing. Carpenter stated that she then was called to respond to a shots fired call in a vicinity close to her location and that she then lost sight of the vehicle. Within a couple of minutes, however, Carpenter said she saw that the vehicle was behind her. The driver of the vehicle stopped the vehicle on his own and exited the car. Carpenter stated that she noticed the driver was bleeding, the car had bullet holes, as though it was "shot into," and there was a female passenger in the car. Carpenter called for medical attention and then turned the investigation over to the backup officers who had arrived at the scene.

¶7    M.M.C. also testified. The State began its questioning of M.M.C. by asking whether she was "nervous about being here today[.]" As relevant to this appeal, M.M.C. testified that on the day of the shooting, she and H.V. had planned to meet friends at Grady's, a bar on Lincoln Avenue, but that she began vomiting on the way. H.V. drove to the bar to let the group know that they would not be joining them. M.M.C. remained in the car and continued to vomit while H.V. went into the bar. M.M.C. testified that when H.V. returned a few minutes later, she was continuing to vomit but she noticed a "guy was passing by." M.M.C. stated that after H.V. got into the car, he pushed her head down and shots were fired into the car. M.M.C. identified the shooter in court as Mendoza. M.M.C. testified that Mendoza and H.V. had known each other for over twenty years.

¶8    H.V. testified, as relevant to this appeal, that he had known Mendoza for almost the entirety of his forty-year life because the two grew up in the same neighborhood. The State continued to probe H.V. about his relationship with Mendoza:

State:  And do you know him from when you were in your early 20's as well?

H.V.:  Yes.

State:  And how – What did you participate in any activities together?

H.V.:  We grow up in the same neighborhood.

State:   Are you both members of the Latin Kings street gang?

Trial Counsel:  Objection.

Trial Court:  Sustained.

State:   Can we approach, Judge?   (Discussion off the record.)

¶9      The State then questioned H.V. about the events leading up the shooting, starting with when he and M.M.C. left Grady's.  H.V. stated that he did not wish to discuss the events in detail:

H.V.:  I really don't want to go there with that.  You know what I mean?  I'm not trying to put myself in any more danger than needs to be that I'm already.

Trial Counsel:  Objection.

Trial Court:  Sustained.  Sustained.

State:   Is there a reason you don't want to answer my question?

H.V.:  Of course.

Trial Counsel:  Objection.

State:  Can we approach, Judge?

Trial Court:  Yes.  (Discussion off the record.)

At the end of the State's questioning, the State emphasized H.V.'s desire not to testify by stating, "[H.V.], you're not here by choice today, are you?"  H.V. responded, "Nope."

5

¶10    Officer Miller testified that when he arrived at the scene of the shooting, H.V. was uncooperative and that Miller placed H.V. in the back of the squad car, a common practice used to calm victims. Miller testified that H.V. indicated that he knew the shooter but did not wish to identify him. The State asked Miller whether H.V. "[told] you why he didn't want to tell you who the person was?" Trial counsel objected, but following a sidebar, the following exchange took place:

> State: Did [H.V.] tell you that he was afraid to tell you who it was that had shot at him?
>
> Miller: Yes, he did.
>
>  ….
>
> State: At any point during the course of the interview, was [H.V.] willing to identify the person who had shot at him?
>
> Miller: No, he was not.

¶11    S.H., Mendoza's girlfriend at the time, testified that on the day of the incident, she drove Mendoza and a few other family members to Grady's. S.H. stated that she dropped Mendoza off at the bar and went to look for parking. S.H. called Mendoza a few minutes later, once she found a parking spot, and Mendoza told her that he "wasn't feeling it" and was getting "a bad vibe." S.H. testified that she drove to pick Mendoza up when she heard gunshots coming from two different directions. S.H. then saw Mendoza standing in the street, near Grady's, and she picked him up. Mendoza told S.H. that "somebody was arguing with him, and he shot in self-defense." S.H. told the jury that while in the car, Mendoza said that he did not shoot first, that he saw a woman vomiting in a car and stopped to ask if everything was ok, and that someone started "talking shit" and shot at him. S.H. also stated that she drove Mendoza to a police station the following day so he could voluntarily turn himself in.

¶12    Detective Enk testified that he interviewed Mendoza and S.H. after Mendoza turned himself in. A portion of the recorded interview was played for the jury. As relevant to this appeal, after the video was stopped, Enk was asked to clarify one of the terms used during the interview:

> State: There are a couple of things I was hoping you could clarify for us. At the end there, you're using the term bang?
>
> Enk: Yes.
>
> State: Can you describe what that term means?
>
> Enk: Bang is a street term reference, being a member of a criminal street gang.

¶13    Mendoza also testified, first telling the jury about his history as an army veteran. Mendoza also told the jury that on May 4, 2014, he went to Grady's and saw H.V. there. Mendoza said that he heard H.V. was "trouble," and that "trouble just follows him." Mendoza stated that he and H.V. were not on bad terms, but that he felt he should leave the bar because he "don't want to be in trouble." Mendoza stated that he walked out of the bar and saw M.M.C. "passed out" in a car and then saw H.V. get into the driver's seat. Mendoza asked H.V. if everything was alright, at which point H.V. began shooting. Mendoza testified that he shot back and got behind the car. H.V. then drove away. Mendoza further testified that he turned himself in later that day. Mendoza insisted that he acted in self-defense, telling the jury, "I can't just let somebody kill me[.]"

¶14    At the close of evidence, the trial court issued the following instruction to the jury:

> Trial Court: During the trial, certain evidence was introduced that during the 1990's [sic], some members of a street gang known as the Latin Kings, were prosecuted for criminal activities. Further, both [H.V.] and Mr. Mendoza acknowledged having a past affiliation with that gang.

7

> This evidence was admitted to establish that [H.V.] and Mr. Mendoza were familiar with one another, prior to the events of May 4 of 2014. You may consider this evidence and give it the weight if any, you feel it deserves. However, you must not infer that gang affiliation has any bearing on the issues of this case, unless you determine that such inferences, are supported by additional independent evidence admitted during this trial.[1]

¶15    The jury returned a verdict of guilty on both counts. The trial court sentenced Mendoza to eight years of initial confinement and two years of extended supervision on count one, and a concurrent term of five years initial confinement and two years extended supervision on count two.

**Postconviction proceedings**

¶16    Mendoza filed a postconviction motion arguing, as relevant to this appeal, that counsel was ineffective for: (1) failing to seek the exclusion of evidence of Mendoza's history with the Latin Kings throughout trial, specifically references to the threat Mendoza posed to witnesses; (2) failing to seek admission of evidence that would have rebutted H.V. and M.M.C.'s testimony that they were fearful of Mendoza; and (3) failing to introduce evidence of Mendoza's posttraumatic stress disorder (PTSD) diagnosis "and how that diagnosis could affect his perceptions and reaction on the night of the shooting, bolstering his defense that he believed he needed to fire to act in self-defense." Mendoza also requested sentence modification based on his PTSD diagnosis.

¶17    The postconviction court granted a *Machner* hearing.[2] At the hearing, Mendoza's trial counsel, Eugene Detert, testified that his strategy at trial

---

[1] We note, however, that Mendoza was never prosecuted for gang related activities and that no evidence of H.V.'s criminal prosecution was brought before the jury.

[2] *See State v. Machner*, 92 Wis. 2d 797, 804, 285 N.W.2d 905 (Ct. App. 1979).

was to argue self-defense, but that the strategy was complicated by "pretrial motions that weren't decided," namely, the State's motion to introduce evidence of Mendoza's gang affiliation. Trial counsel testified that he opposed the introduction of the supposed gang ties between the two men, filing written pleadings opposing the State's request and objecting ahead of trial. Trial counsel noted that he had requested a formal ruling on admissibility on several occasions prior to trial. Trial counsel acknowledged that the State brought up the alleged gang connection during voir dire, and that multiple jurors expressed nervousness. Trial counsel admitted that he did not object to the State's references and stated that he did not remember whether he asked for a sidebar in order to address the implications of the State's questions.

¶18    Trial counsel also acknowledged that the case was essentially a "credibility call" between Mendoza and the victims. Trial counsel stated that he looked up M.M.C. on CCAP[3] and became aware that she "was involved in protecting a boyfriend, a prior boyfriend, who had shot a police officer." The charges against M.M.C. stemmed from her attempts to conspire to testify falsely and recruit witnesses in her then-boyfriend's criminal case. Trial counsel stated he could not recall whether he attempted to retrieve the complaint in that case, nor did he pursue that information because he did not think it would be admissible in court. Trial counsel also stated that he read some criminal complaints issued against H.V., but that he did not have access to federal complaints. Counsel admitted that he was aware of state convictions against H.V., but did not look up the complaints or convictions. Counsel also admitted that he came across a federal

---

[3] "CCAP" refers to Consolidated Court Automation Programs.

court decision for a case in which H.V. "had agreed to testify for the government and then took off before he was ever put on the stand." Trial counsel said that he did not file a motion to admit any form of character evidence pertaining to either H.V. or M.M.C. because he did not think the evidence would have been admissible.

¶19    Trial counsel also stated that he was aware of Mendoza's PTSD diagnosis as well as the severity of Mendoza's condition. Counsel stated that he reached out to the Veteran's Affairs "to see if there was a doctor who … would be willing to testify," but that he did not receive cooperation. Counsel stated that he also inquired with colleagues, but none knew of a psychologist with PTSD expertise for counsel to contact. Counsel ultimately did not inquire further or hire an expert to testify as to the effect Mendoza's diagnosis may have had on his decision to shoot at H.V.

¶20    The postconviction court ultimately found that Detert did not provide ineffective assistance at trial, but that counsel should have raised Mendoza's PTSD diagnosis at sentencing as a mitigating factor. The court granted Mendoza's motion for resentencing, but denied his motion for a new trial.

¶21    This appeal follows.

**DISCUSSION**

¶22    To succeed on a claim of ineffective assistance of counsel, a defendant must demonstrate that counsel's representation was deficient and that the deficiency prejudiced him. *State v. Erickson*, 227 Wis. 2d 758, 768, 596 N.W.2d 749 (1999). Both deficient performance and prejudice present mixed questions of fact and law. *State v. Jeannie M.P.*, 2005 WI App 183, ¶6, 286

Wis. 2d 721, 703 N.W.2d 694. We uphold the trial court's factual findings unless they are clearly erroneous. *See State v. Thiel*, 2003 WI 111, ¶21, 264 Wis. 2d 571, 665 N.W.2d 305. However, we review *de novo* whether counsel's performance was deficient or prejudicial. *See Jeannie M.P.*, 286 Wis. 2d 721, ¶6.

¶23    To prove deficient performance, Mendoza must show that, under all of the circumstances, counsel's specific acts or omissions fell "outside the wide range of professionally competent assistance." *See Strickland v. Washington*, 466 U.S. 668, 690 (1984). To prove prejudice, Mendoza must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

### I.    Counsel was Ineffective for Failing to Object to References to Mendoza's Prior Gang Activity

¶24    Mendoza first argues that counsel was ineffective for failing to object to the State's references to Mendoza's former involvement with the Latin Kings. Specifically, Mendoza argues that the State's references to the Latin Kings, particularly during voir dire, and the implication that the victims were scared to testify because Mendoza would harm them, constituted prejudicial other-acts evidence. We agree.

¶25    WISCONSIN STAT. § 904.04(2) (2017-18)[4] generally "precludes proof of other crimes, acts or wrongs for purposes of showing that a person acted in conformity with a particular disposition on the occasion in question." *State v.*

---

[4] All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

*Johnson*, 184 Wis. 2d 324, 336, 516 N.W.2d 463 (Ct. App. 1994). Under appropriate circumstances, § 904.04(2) allows other-acts evidence to be admitted for other purposes, "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *State v. Hunt*, 2003 WI 81, ¶29, 263 Wis. 2d 1, 666 N.W.2d 771 (citation omitted). Whether other-acts evidence should be admitted requires the application of a three-part test: (1) whether the evidence is offered for a permissible purpose under § 904.04(2)(a); (2) whether the evidence is relevant under WIS. STAT. § 904.01; and (3) whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice, confusion of the jury, or needless delay. *See* WIS. STAT. § 904.03; *State v. Sullivan*, 216 Wis. 2d 768, 772-73, 576 N.W.2d 30 (1998).

¶26    At the *Machner* hearing, trial counsel admitted that he did not object to references to Mendoza's gang affiliation during voir dire and could not recall whether he asked for a side bar discussion regarding the State's implications that witnesses were scared to testify. Counsel also admitted that multiple jurors expressed concern, through nodding, that they revealed personal information about themselves in front of a defendant whom the witnesses were supposedly scared of.

¶27    The State's motion to admit evidence of Mendoza's gang affiliation stated that any evidence of Mendoza's prior gang affiliation would be offered to establish identity and motive. The trial court never ruled on the motion, however it is clear from the record that the evidence was not necessary for any of the State's asserted purposes. Mendoza's identity was never in question because he turned himself in after the shooting. Nor were references to Mendoza's prior gang affiliation necessary to establish Mendoza's connection to H.V., as H.V. testified that he and Mendoza grew up in the same neighborhood and had known each other for approximately forty years—well before Mendoza's gang affiliation. These

references, and others, necessitated a cautionary jury instruction, which further reminded the jury of Mendoza's gang affiliation. As to motive, the State's motion alleged that the shooting was retaliatory, but the issue of retaliation was not clearly explored at trial.

¶28 We conclude that trial counsel was deficient for failing to object to references to Mendoza's gang affiliation, particularly during voir dire, and that this deficiency was prejudicial. The State's references to the Latin Kings during voir dire set the stage for multiple gang references throughout trial and served only to imply to the jury that Mendoza was a dangerous man who likely shot H.V. unprovoked. We conclude that this error, combined with the errors we discuss below, resulted in cumulative prejudice, warranting a new trial.

## II. Counsel was Ineffective for Failing to Introduce Other-Acts Evidence to impeach H.V. and M.M.C.'s credibility

¶29 Mendoza argues that trial counsel "was ineffective in failing to present admissible other acts and evidence pertaining to H.V. and [M.M.C.'s] motive to lie about their fear of [Mendoza] and motive to deny that H.V. had a gun and shot first at [Mendoza]." The crux of Mendoza's argument is that evidence of both H.V.'s and M.M.C.'s prior histories of attempting to falsify testimony and H.V.'s history of attempting to intimidate witnesses and other violent crimes would have rebutted the numerous references to their fear of Mendoza. Mendoza also argues that the evidence would have bolstered Mendoza's self-defense argument because it would support his contention that H.V. had a gun on the night of the shooting, but disposed of it before encountering police to avoid a felon in possession charge.

13

¶30    At the *Machner* hearing, trial counsel admitted that he performed a CCAP search for M.M.C. and was aware of multiple complaints against H.V., but that he did not follow up on any of the information he learned of, nor did he attempt to admit any evidence that could have impeached H.V.'s and M.M.C.'s credibility. Counsel stated that he did not think the evidence would have been admissible.

¶31    While matters of trial strategy are generally left to counsel's professional judgment, counsel may be found ineffective if the strategy was objectively unreasonable. *See State v. Felton*, 110 Wis. 2d 485, 501-03, 329 N.W.2d 161 (1983). We conclude that trial counsel's strategy to ignore potential impeachment evidence, under the facts of this case, was objectively unreasonable. Throughout the course of trial, multiple references suggested that H.V. and M.M.C. were fearful of Mendoza. However, evidence that H.V. and M.M.C. previously intimidated witnesses and conspired to falsify testimony not only would have potentially impeached their credibility, but would have potentially bolstered Mendoza's claim that H.V. had a gun the night of the shooting but disposed of it to avoid criminal charges. Trial counsel admitted that the case posed a "credibility contest" between the victim witnesses and Mendoza. Any information that would serve to undermine H.V. and M.M.C.'s testimony was essential to an effective defense. Accordingly, we conclude that counsel's performance was both deficient and prejudicial.

### III.    Trial Counsel was Ineffective for Failing to Introduce Expert Testimony about Combat-Related PTSD

¶32    Lastly, Mendoza argues that trial counsel was ineffective for failing to retain an expert to testify about Mendoza's PTSD diagnosis and how it affected his behavior, particularly, Mendoza's impulse to act in self-defense. In a self-

defense case, the jury is charged with answering the question of whether the State proved beyond a reasonable doubt that the defendant did not act lawfully in self-defense. One may act intentionally in self-defense if:

(1) "the defendant believed that there was an actual or imminent unlawful interference with the defendant's person;"

(2) "the defendant believed that the amount of force the defendant used or threatened to use was necessary to prevent or terminate the interference; and"

(3) "the defendant's beliefs were reasonable."

WIS JI—CRIMINAL 801.

¶33    At trial, both S.H. and Mendoza testified that when Mendoza entered Grady's, he felt uncomfortable and wanted to leave almost immediately. Mendoza also testified that H.V. had a gun and that he acted in self-defense.

¶34    At the *Machner* hearing, trial counsel acknowledged that Mendoza's PTSD diagnosis could have been relevant to Mendoza's defense in that counsel stated that he attempted to retain an expert to testify about the diagnosis and its effects. Counsel stated that after reaching out to Veteran's Affairs and inquiring with colleagues, he essentially gave up on the search.

¶35    Postconviction counsel, however, retained a psychologist, Dr. Michael Spierer, who reviewed Mendoza's case at length and provided detailed insight into Mendoza's service, diagnosis, symptoms, and mental state. Dr. Spierer's lengthy report stated that it is not uncommon for war veterans to avoid loud places for fear of arousing memories of combat. Dr. Spierer ultimately concluded that:

> Mr. Mendoza's Posttraumatic Stress Disorder symptoms manifest in the form of hyperarousal, emotional numbness and restricted range of affect, a combination of

which contributes to impulsive response patterns without inadequate deliberation. Military records note the finding that Mr. Mendoza described an increased sense of arousal that had not been present prior to his deployment to Iraq.

… It is reasonable to assume that … Mr. Mendoza is likely to have perceived himself as in danger and to have reacted to that perceived danger by attempting to protect himself.

Given their respective backgrounds, Mr. Mendoza's belief that [H.V.] was armed and potentially dangerous, was not unreasonable. In addition, his extensive combat exposure and the Posttraumatic Stress Disorder symptoms growing out of that experience (i.e., hyperarousal, exaggerated startle and emotional numbing) heightened greatly his belief that he was in danger and contributed to his actions on the day of the incident leading to his arrest. It is my opinion that Posttraumatic Stress Disorder played a significant role in Mr. Mendoza's responses during the encounter with [H.V.]

¶36   The postconviction court found Dr. Spierer's report relevant for the purposes of resentencing, but found that trial counsel was not ineffective at trial for failing to produce evidence of Mendoza's PTSD diagnosis. We disagree. Expert testimony regarding Mendoza's PTSD diagnosis may have provided valuable support for Mendoza's defense; particularly with regard to why Mendoza got a "bad vibe," when he walked into Grady's, why he wanted to avoid H.V., and why he shot at H.V. The evidence would have given the jury additional context to evaluate whether Mendoza truly believed that he faced an imminent threat and that his actions were reasonable to protect himself. Mendoza's state of mind at the time of the shooting was directly relevant to his self-defense claim. Mendoza's defense may have been bolstered by expert testimony about his PTSD diagnosis. Accordingly, we conclude that trial counsel's performance was deficient and that the deficiency prejudiced Mendoza's defense.

¶37    We are not confident that the outcome of the trial would have remained the same had counsel collectively:  (1) objected to the State's references to Mendoza's affiliation with the Latin Kings during voir dire; (2) introduced evidence potentially impeaching the credibility of the victim witnesses; and (3) introduced expert testimony regarding Mendoza's PTSD diagnosis and its effect on his state of mind at the time of the shooting.  We conclude that counsel's actions, or lack thereof, resulted in cumulative prejudice.

¶38    For the foregoing reasons, we reverse the trial court and remand for a new trial.

*By the Court.*—Judgment reversed and cause remanded with directions.

Not recommended for publication in the official reports.