GUNDRUM, J.
¶ 1 At approximately 10:40 p.m. on January 13, 2015,[1] two men wearing green masks and blue latex gloves robbed a Citgo convenience store, with the first, shorter, robber shooting and killing the clerk. It is undisputed this first robber was Kenneth Thomas. Both robbers left the scene in a getaway car undisputedly driven by Jerica Cotton.
¶ 2 Based upon evidence it had gathered indicating Darrin Malone was the second robber, the State charged him with felony murder, as a party to the crime, and following a four-day trial, a jury convicted him of that offense. Malone moved for postconviction relief, which motion the trial court denied. He now appeals his judgment of conviction and the denial of his postconviction motion. He claims he is entitled to a new trial for various reasons related to the trial court's admission of "other acts" evidence of a separate robbery. For the following reasons, we conclude the trial court did not err in denying Malone's motion for postconviction relief and he is not otherwise entitled to a new trial.
Background
¶ 3 Prior to Malone's felony murder trial, the State filed a motion to admit evidence, including video footage, of a robbery which occurred at a 7-Eleven convenience store three days prior to the January 13 Citgo robbery. In its motion, supporting brief, and oral argument on the motion, the State argued the 7-Eleven robbery evidence was admissible for the purposes of showing plan and intent[2] ; was relevant; and that the probative value was not substantially outweighed by the danger of unfair prejudice. The State noted the similarities between both robberies: they occurred later in the evening (the 7-Eleven robbery at 9:16 p.m. and the Citgo robbery around 10:40 p.m.) at gas stations/convenience stores in the same approximate area; they involved two male robbers-a shorter robber who entered the store first with a gun, followed by the second robber; the robbers wore masks and had their heads covered; based upon an expert's preliminary determination that shell casings recovered at the Citgo and 7-Eleven were fired from the same weapon, the same 9mm handgun was believed to have been used in the robberies; the first robber fired the gun in the direction of the clerk; the robbers escaped in a waiting getaway car; the two robbers and the driver left from a West Allis apartment building, drove to the store they robbed, and then returned back to the apartment building; and Thomas was the first robber and Cotton was the driver of the getaway car.
¶ 4 In response to the State's motion, Malone asserted there was no evidence he was involved in the 7-Eleven robbery other than Thomas and Cotton stating so, and therefore the "other acts" evidence should not be admitted. The State replied that it would prove the "conditional fact" of Malone's involvement in the 7-Eleven robbery through the statements of Thomas and Cotton. The State pointed out that Cotton and Thomas each told law enforcement that Malone was involved in both robberies "independent of one another without opportunity to confer" and their statements were consistent with the evidence related to the 7-Eleven robbery.
¶ 5 The trial court indicated it had reviewed the Wisconsin Jury Instructions "both for felony murder and for armed robbery." It noted that felony murder "requires there be some other commission of a crime proved by the State," and for that purpose "the elements of armed robbery ... come into play as to the Court's evaluation of what exactly are the elements that have to be proven by the State in order to meet [its] burden here." Considering State v. Sullivan , 216 Wis. 2d 768, 576 N.W.2d 30 (1998), the court acknowledged it needed to consider whether the 7-Eleven robbery evidence was being offered for a proper purpose and was relevant, and whether its probative value was substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury.
¶ 6 While the trial court indicated there were "limitations" because the robbers were masked, it found many significant similarities between the 7-Eleven robbery and the Citgo robbery. The court referenced the evidence the State presented of a similar height disparity between the two robbers in each incident, noting it "b[ore] some significance here." The court noted that both incidents "involved a gas station or minimart, ... occurred at similar times of the day" and were "relatively close" to each other and "directly off of Bluemound Road." The court further noted the assertions that for both robberies Cotton drove Thomas and Malone to and from the sites, "parked in close proximity," Thomas and Malone entered the stores together to conduct the robberies, and then Cotton drove them from the sites. Each incident involved at least one firearm, "a round [was] fired ... in the direction of the clerk," the robbers' "identit[ies were] concealed in both situations in a similar fashion," and it was alleged that "forensically the same firearm is identified as being ... utilized in both incidents."[3] The court concluded that the similarities between the 7-Eleven and Citgo robberies were "remarkable." The trial court ruled that the State could introduce the 7-Eleven robbery evidence, including the video footage, concluding that it was being proffered for the proper purposes of showing a plan and intent (and identity, see supra note 1), was relevant, and would not be confusing or misleading to the jury. The court indicated it would utilize a proper curative jury instruction to ensure any danger of unfair prejudice did not substantially outweigh the probative value of the evidence.
¶ 7 The issue at trial was whether Malone was the second robber in the Citgo robbery/felony murder on January 13.[4] As part of the evidence against Malone, the State played for the jury video footage from the 7-Eleven robbery on January 10. Detective David Feyen testified that the footage was a "montage"[5] from the video surveillance cameras of both the 7-Eleven and a nearby restaurant and that in creating the montage, he selected clips from each of the cameras, omitting parts of the footage where there was "no activity." The following additional relevant evidence was presented at trial.
¶ 8 Detective Caleb Porter testified that around 8:30 a.m. on January 14, he assisted in serving a search warrant, unrelated to the Citgo or 7-Eleven robberies, for Thomas' apartment, apartment two in the West Allis apartment building discussed in this case. Thomas, his sister Shakendra Thomas, and four other individuals were taken into custody, separated, and individually removed from the scene. Porter testified that these individuals would not have been allowed to speak to each other once in custody and that Thomas had remained in police custody since the execution of the warrant. During the search of apartment two, Porter found a green mask, a handgun, clothes matching the description of those worn during the Citgo robbery, and license plates for a vehicle belonging to Cotton. While Porter was executing the warrant on apartment two, the door to apartment three across the hall opened, and Porter observed Mandy Love and Malone inside that apartment. Porter described Malone as being "bald ... [h]e did not have any hair on his head." Porter testified that when he later interviewed Malone, Malone acknowledged knowing Cotton, through Love, and being at apartment three, which was Love's apartment, the night of January 13; however, Malone insisted he "never interacted with [Thomas], did not know him, and had never been in" Thomas' apartment across the hall.
¶ 9 Detective Edward Bergin testified that in searching apartment three (pursuant to Love's consent) on January 14, he found a light blue "latex" glove on a coffee table in the living room, which glove "appeared to be the same type of glove that was worn by the suspects in the surveillance video" from the Citgo robbery. While Exhibit 5, a still photo from that Citgo video footage, was displayed on a screen for the jury, Bergin described depicted details:
This ... is the first shorter subject who first entered the store. This is the tan jacket, green Halloween mask, the Boston Celtics hat. That's the black glove he has on [one hand]. That's the blue latex glove he has on [the other hand]. This is a handgun that he's holding. These are plaid pajama-style pants, red, gray, and black in color....
This subject in the background is the second suspect who entered the store, green Halloween mask, the plaid baseball style hat, dark colored jacket. You can see a white shirt underneath. Blue latex gloves, dark pants.
Bergin also testified to similar detail in the video footage from the Citgo robbery, which was played for the jury, adding that the first robber appeared to be approximately six inches shorter than the second.
¶ 10 Detective Daniel Neumann testified to items related to Malone that he found during the search of apartment three on January 14. The items included official government documents with Malone's name on them, one of which was dated September 15, 2014, and included a picture of Malone which showed him as being a bald African-American man.
¶ 11 Detective Michael Carpenter testified regarding his analysis of Cotton's cell phone, utilizing a Google map to show the various locations Cotton's phone traveled the night of January 13. He indicated Cotton's phone was at the West Allis apartment building at 10:16 p.m.; traveled west along I-94 and eventually arrived in the area of the Citgo at 10:39 p.m.; remained in that area for four minutes, departing at 10:43 p.m.; and then "travel[ed] eastbound towards Milwaukee," returning to the apartment building "at approximately 11 p.m." He testified that police first received a call about the Citgo robbery and shooting at 10:44 p.m.
¶ 12 Feyen testified to Exhibit 7, twelve still photos taken from a video recording of the inside of the West Allis apartment building back entryway leading to apartments two and three. He stated that the first set of six photos show two men, one wearing a tan jacket, leaving the apartment building, followed by "a female with reddish hair," and the next six photos depict "a taller male wearing a white shirt" entering the apartment building followed by another male and a "female with reddish hair." Feyen testified that the computer "time stamps" for the two sets of photos indicate that the first set was taken at 10:15 p.m. and the second set was taken at 11:00 p.m. on January 13.
¶ 13 Shakendra testified that she was at apartment two when police searched it the morning of January 14. She confirmed that Malone, whose name she did not know at the time, would sometimes come over to apartment two, and on the night of January 13, he and Thomas were "hang[ing] out" together and playing cards in apartment two.
¶ 14 The prosecutor read aloud a written statement Shakendra gave to Bergin on January 14. According to the statement, Shakendra took a shower "around 9 to 10 p.m." on January 13, and afterwards "Kenneth and the bald guy left to go to the store," but she did not know how long they were gone because she was "high" at the time. The prosecutor asked Shakendra about the accuracy of this portion of the statement, to which Shakendra responded, "I signed my signature, so I guess this is what I said."[6] Though Shakendra expressed she did not remember telling the detective many of the details in the statement, she confirmed that it was her signature on the statement and that she had signed it after the detective had read it to her, or let her read it herself, and she had verified its accuracy.
¶ 15 Love testified that she was "best friends" with Cotton and that Malone would sometimes stay in her apartment, apartment three, and had stayed there the night of January 13, but was "kind of in and out [of the building] through the night."
¶ 16 Cotton testified that she knew Malone through Love, would sometimes see him at Love's apartment, and she and Malone would sometimes call or text each other. She knew Thomas because he lived across the hall from Love. Cotton stated she and Malone were at Love's apartment on January 13, and she identified herself, Thomas, and Malone as the three people shown in Exhibit 7 leaving the apartment building together on January 13. She testified to driving Malone and Thomas to a location near the Citgo, Malone and Thomas exiting the vehicle, and Malone and Thomas returning to her vehicle "running" a few minutes later. They drove away, returning to the apartment building. During the ride back, Thomas said, "I think I shot somebody, I think I shot him." Following that comment, Malone whispered something to Thomas.
¶ 17 Cotton testified that when the three arrived back at the apartment building, Thomas left his jacket in the vehicle and Malone left the jacket and plaid hat he had been wearing, all of which items Cotton later disposed of. They entered the apartment building through the same entryway from which they had exited. Cotton identified photos 7 and 8 of Exhibit 7 as photos of Malone entering the building when they returned from the Citgo robbery. She identified Thomas and herself following Malone into the building in the subsequent photos of that exhibit.
¶ 18 Cotton acknowledged that following the Citgo robbery, she told law enforcement that on January 13 she "went outside [of apartment three] to the hallway and there was Mr. Malone and Mr. Thomas"; she left the apartment building with them but was not aware they were going to commit a robbery; and "when Mr. Malone came back from the Citgo station he was running to [her] vehicle."
¶ 19 Cotton also testified that on January 10, three days before the Citgo robbery, she drove Malone and Thomas to the "Motel 6 in Brookfield." Malone and Thomas exited her vehicle there and she waited nearby until they came running back to her vehicle, at which time she drove them back to the West Allis apartment building. Cotton acknowledged that several days prior to the start of Malone's trial, the State offered her a plea deal in which the prosecutor offered to amend the felony murder charge against her to armed robbery, with the State recommending no more than ten years of initial confinement, if she testified truthfully at Malone's trial.
¶ 20 On cross-examination, Cotton was challenged with inconsistencies between her testimony and her statement to law enforcement, as well as with "lie[s]" she made in her statement purportedly to please law enforcement. She confirmed she initially told law enforcement that she had not been involved in the Citgo robbery and that she "denied knowing anything about Mr. Malone being involved." On redirect examination, Cotton confirmed that her trial testimony that Malone was involved with Thomas and her in the Citgo robbery was the truth.
¶ 21 Thomas also testified. Malone would occasionally come over to Thomas' apartment to "hang out," and on the night of January 13, Malone came over and they planned to rob a store in Brookfield. Malone and Thomas left apartment two with green masks, and Malone took "hospital" gloves with him, but Thomas only had one such glove, so he took that one and a winter glove. Thomas took a "Hi Point 9 millimeter" gun. Malone got Cotton from apartment three, and Thomas, Cotton, and Malone went down the back staircase and left the building together. They departed in Cotton's car, driving west along I-94, exiting near "the Motel 6" in Brookfield. When they discovered that the establishment they had intended to rob was closed, they drove until they reached the Citgo, which they then decided to rob.
¶ 22 Cotton stopped the car near the Citgo, Thomas and Malone exited the vehicle, walked to the side of the store, put their masks and gloves on, and then entered to commit the robbery, with Malone behind Thomas. Thomas stole money, shot the clerk, left the store and ran to Cotton's waiting car. Cotton drove and Malone sat in the front passenger seat while Thomas was in the back seat. As they drove back to the West Allis apartment building, Thomas exclaimed that he thought he had shot the clerk. Thomas testified that Cotton later disposed of the masks, gloves and hats they had worn during the robbery. Thomas took a lot of drugs, fell asleep, and the next thing he remembers is the police raiding his apartment the morning of January 14. He testified he has been incarcerated ever since and has not seen or spoken with Cotton since the night of January 13.
¶ 23 Thomas further testified that he, Malone and Cotton also robbed the 7-Eleven in Brookfield on January 10, explaining that for that robbery they also left from the West Allis apartment building and drove west on I-94 to Brookfield. After exiting I-94, Cotton let Thomas and Malone out of the vehicle at the "Motel 6," and the two walked until they reached the 7-Eleven. Thomas and Malone entered the store wearing "a ripped up shirt" tied around their faces as a mask. Wielding the same gun as in the Citgo robbery, Thomas fired a shot at the clerk "[t]o scare him," and then gave the gun to Malone so Thomas could "get the merchandise." After they left the store, they entered Cotton's waiting vehicle, and Cotton drove them back to the West Allis apartment building.
¶ 24 Thomas testified that when the police first talked to him following the Citgo robbery, he told them "[a] bunch of lies," telling them that he was not involved in either the Citgo or 7-Eleven robbery. After the police started asking him about Malone, Thomas tried to blame Malone, saying Malone must have planted the evidence that the police had found in Thomas' apartment. Thomas testified that he eventually started telling the police "more of the truth." At some point during the interview, Thomas spoke with his mother and the last words she said to him were "do the right thing." He then saw a "chance to make her happy," so he "did the right thing" by "start[ing] to tell the story."
¶ 25 Thomas acknowledged that the State had charged him with first-degree murder, which would put him in prison for the rest of his life, but offered to amend the charge to felony murder and recommend "40 years" if he "testified truthfully." He effectively viewed the forty years as a life sentence as well, so it did not seem like much of a "bargain" to him. He said he was testifying because "[i]t's the right thing to do."
¶ 26 During cross-examination, Thomas admitted he initially "told lies to the police about what had happened" and tried to implicate Malone and Clarence Harris, another man associated with apartment three, in the Citgo robbery. Thomas acknowledged that when the police told him the bullets from the Citgo robbery matched the bullets from another robbery, Thomas "blamed" Malone and Harris for that other robbery too. Thomas further acknowledged that the police had explained to him the penalties for a first-degree intentional homicide conviction compared to those for a lesser offense and had indicated to him that he would get life in prison if he did not cooperate with them, but if he cooperated he "could get as little as 20 years."
¶ 27 On redirect examination by the State, Thomas confirmed he was aware that the agreement he had with the State at the time of trial was that the charges against him would be for armed robbery and felony murder, which together carried a maximum penalty "[c]loser to 100 years," but that he was nonetheless there testifying truthfully. Thomas also confirmed that although the police had indicated during the interview that a "white guy" had robbed the 7-Eleven with Thomas, "a white guy" did not go "with [him] to do [that] robbery." On recross-examination, Thomas acknowledged that he had not yet pled in his case but that it had been "put over" until after he testified in Malone's trial.
¶ 28 Detective Servando Benitez testified that he had reviewed with Feyen the video recording of the inside of the West Allis apartment building entryway for the night of January 13. Benitez confirmed he had observed "designate[d] times on the video" which showed "Kenneth Thomas, Jerica Cotton, and Darrin Malone leaving the building" at approximately 10:15 p.m. that night and returning at approximately 11:00 p.m. Benitez also testified that when he interviewed Malone following the Citgo robbery, Malone had "no hair on his head." During that interview, an audio-video recording of which was played for the jury, Malone stated he did not know Thomas and denied being involved in the Citgo robbery.
¶ 29 During deliberations, the jury requested and was permitted to see, among other things, Exhibit 7-the still photos taken of the apartment building entryway the night of January 13. The jury also requested to view "up close" Exhibits 10 and 11-the videos of the Citgo and 7-Eleven robberies, respectively. The court permitted such viewings, following which the jury continued deliberations and subsequently returned with a guilty verdict.
¶ 30 After sentencing, Malone filed a motion for postconviction relief. The court denied the motion, and Malone appeals.
Discussion
¶ 31 Malone contends on appeal, as he did in his postconviction motion, that he is entitled to a new trial on the basis that the trial court erred in admitting "other acts" evidence of the 7-Eleven robbery. He also asserts his trial counsel performed ineffectively by failing to introduce at trial additional video footage from the 7-Eleven robbery, which footage he claims is exculpatory because it shows the right hand of the second robber in that robbery as being "white"/Caucasian while Malone is African-American and that this showing would undermine the credibility of key state witnesses. He further claims he is entitled to a new trial in the interest of justice and that his due process right to a fair trial was violated when the State presented the 7-Eleven montage video without the additional video footage, particularly in light of the fact Feyen testified he only omitted from the montage video footage that showed "no activity." We conclude Malone is not entitled to a new trial as the trial court did not err in admitting the other acts evidence or in denying his motion for postconviction relief.
Other Acts Evidence
¶ 32 We first address whether the trial court erred in permitting the State to present evidence of the 7-Eleven robbery at Malone's trial.
¶ 33 "Other acts evidence may not be introduced to show that the defendant has a certain character trait and, in the present charge, acted in conformity with that trait." State v. Gray , 225 Wis. 2d 39, 49, 590 N.W.2d 918 (1999). Other acts evidence may be admitted, however, if offered for a proper purpose such as to show "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Id . (citing WIS. STAT. § 904.04(2) ). Even if offered for a proper purpose, to be admitted at trial, other acts evidence must be relevant, WIS. STAT. § 904.02, and its probative value cannot be "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury," among other considerations, WIS. STAT. § 904.03. See also Gray , 225 Wis. 2d at 49.
¶ 34 We will uphold a trial court's decision to admit other acts evidence unless the court erroneously exercised its discretion. State v. Murphy , 188 Wis. 2d 508, 517, 524 N.W.2d 924 (Ct. App. 1994). Here the trial court did not erroneously exercise its discretion in admitting the 7-Eleven robbery evidence.
Plan
¶ 35 Other acts evidence is admissible to show "a definite prior design, plan, or scheme which includes the doing of the act charged.... [T]here must be 'such a concurrence of common features that the various acts are materially to be explained as caused by a general plan of which they are the individual manifestations.' " Gray , 225 Wis. 2d at 53 (alteration in original; citation omitted). "Whether there is a concurrence of common features is generally left to the sound discretion of the trial courts." Id. at 51 (citation omitted).
¶ 36 Gray is instructive for the case now before us. Gray was convicted after a trial of attempting to obtain a controlled substance by misrepresentation, as a party to the crime. Id. at 45-46. Gray argued on appeal that the trial court erred in admitting other acts evidence which included prior uncharged forged prescriptions because the jury, Gray asserted, could not conclude he was the individual who forged the prescriptions. Id. at 47. The supreme court disagreed, noting that the "[e]vidence of the uncharged forged prescriptions ... carries a strong concurrence of common features, sufficient to show a plan." Id. at 54. The court noted that "[t]he narcotic for the charged and uncharged forged prescriptions is the same; several of the patients' and doctors' names are the same; and the prescriptions were all filled or attempted to be filled at the same pharmacy and within a five-month period." Id.
There is such a concurrence of common features that the various forged prescriptions, charged and uncharged, can materially be explained as caused by a general plan of which each forged prescription is an individual manifestation. Because our review of the record shows a common concurrence of features between the current charge and the other acts evidence, we conclude that there is a basis in the record for the circuit court to admit this other acts evidence to show a plan or scheme.
Id.
¶ 37 Malone asserts on appeal that the similarities between the 7-Eleven and the Citgo robberies are common to many armed robberies. He further emphasizes differences between the two robberies, such as the different types of mask worn in each robbery.
¶ 38 We conclude the trial court did not err in determining the 7-Eleven robbery was sufficiently similar to the Citgo robbery to warrant admission of the 7-Eleven robbery evidence to show a plan. We reiterate the significant similarities between the two robberies: they occurred within three days of each other at gas stations/convenience stores; they were committed later in the evening by two male robbers, with the notably shorter robber entering the store first and wielding a handgun and the second robber following; the robbers wore masks and had their heads covered; the first robber fired the gun in the direction of the clerk; the robbers escaped in a getaway car waiting for them nearby; the robbers and getaway driver had driven along I-94 from the West Allis apartment building, exited in the Brookfield area near the Motel 6, robbed the convenience store, and then drove back to the West Allis apartment building; and Thomas was the first robber and Cotton was the getaway driver.
Intent
¶ 39 The trial court also appropriately concluded that the 7-Eleven robbery evidence was admissible to show Malone's intent related to the felony murder. The court noted that it looked to the elements necessary to prove felony murder, which in this case required proving that Malone committed the elements of being party to the crime of armed robbery by use or threat of use of a dangerous weapon. As the court instructed Malone's jury, to prove this, the State was required to show that Malone either directly committed armed robbery by use or threat of use of a dangerous weapon or "intentionally aid[ed] and abet[ted] the person who directly committed it." The court further properly instructed the jury that
[a] person intentionally aids and abets the commission of a crime when, acting with knowledge or belief that another person is committing or intends to commit a crime, he knowingly either assists the person who commits the crime or is ready and willing to assist and the person who commit[s] the crime knows of the willingness to assist .
To intentionally aid and abet armed robbery by use or threat of [use of] a dangerous weapon, the defendant must know that another person is committing or intends to commit the crime of armed robbery by use or threat of [use of] a dangerous weapon and have the purpose to assist the commission of that crime .
(Emphasis added.) See also WIS JI-CRIMINAL 1032. The State also was required to prove the elements of armed robbery by use or threat of use of a dangerous weapon, which required, as the court instructed the jury, that Malone
with the intent to steal and by use or threat of use of a dangerous weapon, takes property from the person or presence of the owner by using force against the person of the owner with the intent to overcome physical resistance or physical power of resistance to the taking or carrying away of the property.
(Emphasis added.) See also WIS JI-CRIMINAL 1480.
¶ 40 The State bore the burden of proving Malone's intent in entering the Citgo on January 13, and the 7-Eleven robbery evidence aided in proving that intent. Furthermore, without the 7-Eleven robbery evidence, Malone may have testified and argued to the jury that he had no clue Thomas possessed a gun when he entered the Citgo, much less intended to use it or any force to overcome any resistance to their plan to steal from the Citgo. The evidence of the 7-Eleven robbery established the second robber's knowledge that Thomas brought to and used a gun during that robbery, so the jury would be less likely to believe any potential testimony or argument by Malone that he was unaware Thomas had or would use a gun during the Citgo robbery just three days later. The 7-Eleven robbery evidence was properly admitted to show Malone's intent.[7]
Relevance
¶ 41 Even if offered for a proper purpose, other acts evidence should only be admitted if it is relevant. Here, Malone asserts evidence of the 7-Eleven robbery was not relevant to the Citgo felony murder charge because "Mr. Malone was not sufficiently identified as the perpetrator" of the 7-Eleven robbery.[8] We again look to Gray .
¶ 42 Gray argued that evidence of prior uncharged forged prescriptions was not relevant because "the State failed to produce any evidence to connect him with the other acts evidence" of those prescriptions, which prescriptions were introduced as exhibits at his trial. Gray , 225 Wis. 2d at 58. Gray argued the court erred in allowing testimony regarding these exhibits because, he claimed, there was no proof connecting him to those prescriptions. Id. at 58-59. Malone makes a similar argument here, contending the 7-Eleven robbery evidence should not have been permitted because it was insufficient to connect him to the 7-Eleven robbery as it was largely based upon the testimony of Thomas and Cotton "who got beneficial plea offers in exchange for their testimony." Based upon Gray , we reject this contention.
¶ 43 As the Gray court stated, "other acts evidence may consist of uncharged offenses," and so long as "a reasonable jury could find by a preponderance of the evidence that the defendant committed the other act," it may be properly admitted. Id. at 59, 62 (emphasis added); see also State v. Gribble , 2001 WI App 227, ¶¶ 36-41, 248 Wis. 2d 409, 636 N.W.2d 488 (affirming the trial court's admission of other acts evidence because there was "sufficient evidence for a reasonable jury to find by a preponderance of the evidence that Gribble [was the person who] caused the [prior] burn injury to [the victim]"). On review of a ruling admitting such evidence we must "consider all the evidence presented to the jury to determine whether there is sufficient evidence" from which a reasonable jury could make such a finding. See Gray , 225 Wis. 2d at 61-62.
¶ 44 Here, the evidence presented to the jury sufficiently showed that Malone was the second robber in the 7-Eleven robbery. The evidence showed that without having an opportunity to confer with each other following Thomas' arrest the morning after the Citgo robbery, both Thomas and Cotton informed law enforcement in the days that followed that robbery that Malone was also the second robber in the 7-Eleven robbery. Both testified to the same at trial, with Thomas providing substantial details.
¶ 45 Of course there was also other evidence presented at trial regarding the 7-Eleven robbery. As previously indicated, the jury was shown the montage video of the 7-Eleven robbery, Exhibit 11. That video provides a brief glimpse of the skin between the eyes of the second robber. Malone suggests this footage shows that the second robber in that robbery was a Caucasian man, not African-American Malone. Reviewing the video ourselves, we conclude as the trial court did at the postconviction hearing that the video does not conclusively establish that the second robber was Caucasian. While we agree that a reasonable jury could conclude from that glimpse that the second robber may have been Caucasian, it is not so conclusive as to completely negate the testimony of Thomas and Cotton that the second robber in the 7-Eleven robbery was Malone. Based upon all the evidence presented at trial, a reasonable jury "could find by a preponderance of the evidence" that Malone was the second robber in that robbery; thus the 7-Eleven robbery evidence was relevant. See id. at 59, 62.
¶ 46 We conclude the trial court did not erroneously exercise its discretion in admitting the 7-Eleven robbery evidence at trial.[9]
Ineffective Assistance of Counsel
¶ 47 Malone also claims he is entitled to a new trial on the basis that his trial counsel performed ineffectively by not presenting at trial the additional video footage which was omitted from the 7-Eleven video montage and which shows the right hand of the second robber in the 7-Eleven robbery. Malone asserts the footage shows that the right hand of the second robber is the hand of a Caucasian man.[10] Malone has not convinced us that a new trial is warranted.
¶ 48 To succeed on an ineffective assistance of counsel claim, a defendant must show that counsel's performance was deficient and the deficiency prejudiced him/her. State v. Erickson , 227 Wis. 2d 758, 768, 596 N.W.2d 749 (1999). The defendant bears the burden of proof on both prongs, State v. Smith , 207 Wis. 2d 258, 273, 558 N.W.2d 379 (1997), and if he/she fails to prove one prong, we need not address the other, Strickland v. Washington , 466 U.S. 668, 697 (1984). Here, we conclude Malone failed to show he was prejudiced by counsel's performance and, thus, we need not address whether counsel's performance was deficient. See id. ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.").
¶ 49 To prove prejudice, the defendant must show there is a "reasonable probability" that but for counsel's alleged unprofessional errors, "the result of the proceeding would have been different." Id. at 694. "A reasonable probability is 'a probability sufficient to undermine confidence in the outcome.' " State v. Jeannie M.P. , 2005 WI App 183, ¶ 26, 286 Wis. 2d 721, 703 N.W.2d 694 (citation omitted). To show prejudice, "[t]he likelihood of a different result must be substantial, not just conceivable." Harrington v. Richter , 562 U.S. 86, 112 (2011). Speculation about what the result of the proceeding might have been is insufficient. Erickson , 227 Wis. 2d at 774.
¶ 50 Whether a defendant was prejudiced by an error presents a mixed question of fact and law. Jeannie M.P. , 286 Wis. 2d 721, ¶ 6. We uphold the trial court's factual findings unless they are clearly erroneous, State v. Thiel , 2003 WI 111, ¶ 21, 264 Wis. 2d 571, 665 N.W.2d 305, but whether counsel's performance was prejudicial is a question of law we review de novo, Jeannie M.P. , 286 Wis. 2d 721, ¶ 6.
¶ 51 Malone contends there is a reasonable probability the result of his felony murder trial would have been different if trial counsel had either objected to the State's use of the 7-Eleven robbery video montage, Exhibit 11, without the additional video footage included in it or had shown the additional footage himself. Malone claims the additional footage would have undermined Thomas' and Cotton's testimony that he was the second robber in both robberies. He also argues the additional footage would have impeached Feyen's testimony because Feyen created Exhibit 11 for trial, and while Feyen testified that some footage had been omitted, he also indicated he had omitted "no activity" from the video when in fact he had omitted the footage which, Malone claims, shows that the hand of the second 7-Eleven robber was the hand of a "white"/Caucasian man, not him.
¶ 52 As previously stated, Cotton and Thomas both testified that Malone was the second robber in the 7-Eleven robbery and the Citgo robbery. Malone's trial counsel made significant efforts toward impeaching both Cotton and Thomas with the fact that they had received plea deals from the State in exchange for testifying at trial, had lied to law enforcement in the course of the investigation into the Citgo robbery, and had prior convictions. The jury had strong reason to question their credibility. Malone asserts that the additional 7-Eleven video footage would have further undermined their credibility-and relatedly their testimony that Malone was the second robber in the Citgo robbery. If the jury believed the second robber in the 7-Eleven robbery was a Caucasian man, Malone appears to argue, then it necessarily would conclude Cotton and Thomas were lying about African-American Malone being the second robber in that robbery and would be more likely to conclude they were also lying about Malone being the second robber in the Citgo robbery.
¶ 53 At the postconviction hearing, the trial court found, based upon its review of the additional video footage of the 7-Eleven robbery, that the video was inconclusive as to whether the second robber in that robbery was Caucasian or not. Whether because of video quality or lighting issues (discussed by the court[11] ) or the possibility the second 7-Eleven robber could have been wearing white "hospital"/"latex" gloves similar to the blue "hospital"/"latex" gloves the two Citgo robbers wore, based upon the totality of the 7-Eleven robbery evidence presented, we cannot say with sufficient certainty that the second robber in the 7-Eleven robbery was Caucasian so as to conclude the trial court clearly erred in its finding. See State v. Walli , 2011 WI App 86, ¶ 17, 334 Wis. 2d 402, 799 N.W.2d 898 ("[W]hen evidence in the record consists of disputed testimony and a video recording, we will apply the clearly erroneous standard of review when we are reviewing the trial court's findings of fact based on that recording."). More importantly, because the evidence presented at trial that Malone was the second robber in the Citgo robbery/felony murder was overwhelming, we conclude that even if trial counsel had further impeached Cotton, Thomas and Feyen with the additional video footage from the 7-Eleven robbery, there is no reasonable probability the jury would not have found Malone guilty of the Citgo felony murder.
¶ 54 Feyen testified to Exhibit 7, the photos of the inside of the West Allis apartment building entryway leading to apartments two and three. He stated that the first six of these photos from the night of the Citgo robbery show two men, one wearing a tan jacket, leaving the apartment building at 10:15 p.m. followed by "a female with reddish hair." Reviewing the photos ourselves, we note that they show the side-back of the three individuals and a reasonable juror could easily conclude that both men are African-American. It is undisputed that the woman in these photos with "reddish hair" is Cotton and the man wearing the tan jacket is Thomas.
¶ 55 Feyen testified that the second six photos depict "a taller male wearing a white shirt" entering the apartment building at approximately 11:00 p.m. followed by another male and a "female with reddish hair." Based upon our own review of the photos, the taller male unquestionably appears to be bald and a reasonable juror could easily conclude that both men are African-American. No suggestion to the contrary has been made on either point. Other evidence presented at trial established both that the height disparity between the first and second robber in the Citgo robbery was approximately six inches and that this disparity is consistent with the height disparity between Malone and Thomas.[12] Again, it is undisputed that the woman and the shorter male depicted in the second set of photos are Cotton and Thomas, respectively. Of significance, however, is the fact that Cotton testified that the bald, taller male wearing the white shirt in the photos is Malone. Benitez also testified that "Malone" could be seen (in the photos) "leaving the building" around 10:15 p.m. and returning around 11:00 p.m. Malone has not identified for us, and we are unable to find, anywhere in the record or briefing where he has argued that the bald-headed, apparently African-American man shown in the still photos of Exhibit 7 is not him,[13] and the evidence presented at trial was that it is him.
¶ 56 Malone, however, asserts that Feyen's testimony would have been undermined by the introduction of the additional video footage from the 7-Eleven robbery. Malone suggests jurors would have questioned Feyen's credibility because he had omitted the additional video footage showing the second robber's apparently "white" right hand and then had testified that while he removed some portions of the video in making the montage, he did not omit any "activity."
¶ 57 Feyen, however, was not the only law enforcement officer to testify as to the individuals leaving and returning to the apartment building approximately twenty minutes before and after the Citgo robbery. As previously indicated, Benitez, whose credibility was not in question before the jury or on appeal, also testified that the key photos of the apartment building entryway show Malone leaving the apartment building with Cotton and Thomas at 10:16 p.m. the night of the Citgo robbery and returning with them at 11:00 p.m. Additionally, Carpenter testified that based upon his analysis of Cotton's cell phone, her phone was at the apartment building at 10:15 p.m., traveled west along I-94 and eventually arrived in the area of the Citgo around 10:39 p.m., remained in that area for approximately four minutes and departed at 10:43 p.m., and then traveled back to the apartment building, arriving at approximately 11:00 p.m. The Citgo robbery occurred in the midpoint of the 10:15-11:00 p.m. time frame, and it is undisputed, and was undisputed at trial, that Thomas and Cotton both participated in it. Thus, when the key apartment building entryway footage was captured at 11:00 p.m., Cotton and Thomas indisputably had just finished participating in the Citgo robbery approximately twenty minutes earlier. And Malone was now entering the apartment building with them. Quite simply, it is beyond difficult to believe Malone walked into the apartment building with Cotton and Thomas at that critical time just by chance. The only reasonable conclusion the jury could make was that Malone walked in with them at that time because he had just participated in the Citgo robbery with them, as Cotton and Thomas testified.
¶ 58 But there is more. Bergin's undisputed testimony was that the morning after the Citgo robbery he found a light blue latex glove in apartment three, Love's apartment across the hall from Thomas' apartment, which glove "appeared to be the same type of glove that was worn by the suspects in the [Citgo] surveillance video." Love, whose credibility was not questioned at trial or on appeal, testified that Malone stayed at her apartment the night of January 13, and Malone was "kind of in and out" of the building that night. Malone does not challenge any of this evidence.
¶ 59 In addition, Bergin testified that Exhibit 5, a photo of the Citgo robbery which was displayed for the jury on a screen while he testified, as well as the video of that robbery, Exhibit 10, showed the second robber wearing "a white shirt" underneath his jacket and "dark pants." This testimony appears consistent with our own review of these exhibits. In the photos of Malone entering the building with Cotton and Thomas at 11:00 p.m. on January 13, the shirt he is wearing appears to be "white"[14] and his pants appear to be "dark," consistent with Bergin's description of the shirt and pants the second robber was wearing in the Citgo video.[15]
¶ 60 Also, Thomas' sister, Shakendra, told police she had taken a shower around 9:00 to 10:00 p.m. on the night of the Citgo robbery, and after she was finished, Thomas and "the bald guy" left to go to the store. The evidence at trial established that none of the men affiliated with the West Allis apartment building or Cotton or Thomas was bald other than Malone.
¶ 61 Malone was on trial for the Citgo felony murder, not the 7-Eleven robbery. Whether he did or did not commit the 7-Eleven robbery with Cotton and Thomas, the evidence is overwhelming that he did commit the Citgo robbery/felony murder with them. We conclude there is not a reasonable probability the outcome of Malone's felony murder trial would have been any different if the introduced evidence of the 7-Eleven robbery had not been introduced or if the additional video footage of that robbery also had been introduced. Our confidence in the verdict is not undermined.
Due Process Right to a Fair Trial
¶ 62 Malone also claims he was deprived of his "due process right to a fair trial" because Feyen made the 7-Eleven video montage, Exhibit 11, at the request of the State and that exhibit unfairly omitted the additional video footage that showed the "white" hand of the second robber in the 7-Eleven robbery. As the State points out, Malone forfeited this issue by not objecting at trial to this allegation of misconduct by the State; thus we review this challenge under the ineffective-assistance-of-counsel rubric. See State v. Haywood , 2009 WI App 178, ¶ 15, 322 Wis. 2d 691, 777 N.W.2d 921 (holding that because "Haywood did not object to what the prosecutor did," he "forfeit[ed] his right to have review other than in an ineffective-assistance-of-counsel context"); see also State v. Carprue , 2004 WI 111, ¶ 47, 274 Wis. 2d 656, 683 N.W.2d 31 ("The absence of any objection warrants that [the court] follow 'the normal procedure in criminal cases,' which 'is to address waiver within the rubric of the ineffective assistance of counsel.' " (citation omitted) ). However, because Malone develops no ineffective assistance of counsel argument with respect to this claim, he cannot prevail.
Interest of Justice and Discretionary Reversal under WIS. STAT. § 752.35
¶ 63 Malone also claims he is entitled to a new trial in the interest of justice because the real controversy was not fully tried and a miscarriage of justice has occurred. He alternatively seeks reversal under WIS. STAT. § 752.35, essentially based upon the same arguments he made under his other claims. We reject each contention.
¶ 64 Wisconsin courts "approach[ ] a request for a new trial with great caution." State v. Avery , 2013 WI 13, ¶ 38, 345 Wis. 2d 407, 826 N.W.2d 60 (citation omitted). Reversals in the interest of justice should be "rare and reserved for exceptional cases." State v. Kucharski , 2015 WI 64, ¶ 41, 363 Wis. 2d 658, 866 N.W.2d 697. We will uphold the trial court's denial of Malone's request for a new trial in the interest of justice unless the court erroneously exercised its discretion. See State v. Hurley , 2015 WI 35, ¶ 30, 361 Wis. 2d 529, 861 N.W.2d 174.
¶ 65 Malone insists the real controversy was not fully tried in this case because the jury was not shown the additional video footage from the 7-Eleven robbery, which, again, Malone argues suggests the second robber in that robbery was Caucasian, while Malone is African-American. This goes nowhere. As we have thoroughly discussed, the real controversy in Malone's trial was whether he was the second robber in the Citgo robbery/felony murder. Evidence suggesting a Caucasian man might have been the second robber in the 7-Eleven robbery does not undermine the compelling evidence that Malone was the second robber in the robbery at issue before the jury-again, the Citgo robbery.
¶ 66 Malone's contention that a miscarriage of justice has occurred fares no better. We could conclude there was a miscarriage of justice if "there is a substantial probability that a new trial would produce a different result." Kucharski , 363 Wis. 2d 658, ¶ 5 (citation omitted). Malone believes "a new trial-either absent the other acts evidence or including the full video from the [7-Eleven robbery]-would likely produce a different result." For the reasons already explained, we cannot agree. The trial court did not err in denying Malone's motion for a new trial in the interest of justice.
¶ 67 We conclude reversal is also inappropriate under WIS. STAT. § 752.35. This statute provides:
In an appeal to the court of appeals, if it appears from the record that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried, the court may reverse the judgment or order appealed from, regardless of whether the proper motion or objection appears in the record....
As indicated, the real controversy has been fully tried and justice has not miscarried.
By the Court. -Judgment and order affirmed.
Not recommended for publication in the official reports.

Hereafter, every date we refer to will be a "2015" date unless otherwise indicated.

The State argued, and the trial court agreed, that the 7-Eleven robbery evidence also was admissible for the purpose of showing identity. Because we herein conclude the trial court properly admitted the evidence for the purposes of showing plan and intent, we do not address whether it also was properly admitted for the purpose of showing identity. See State v. Murphy , 188 Wis. 2d 508, 518, 524 N.W.2d 924 (Ct. App. 1994) ("Evidence of other acts need only be relevant to one of the purposes enumerated in [ Wis. Stat. ] § 904.04(2) before it is admissible." (citing State v. Speer , 176 Wis. 2d 1101, 1114, 501 N.W.2d 429 (1993) ) ); see also State v. Bustamante , 201 Wis. 2d 562, 574 n.8, 549 N.W.2d 746 (Ct. App. 1996).
Wisconsin Stat. § 904.04(2) (2015-16) is substantially unchanged from the version cited by the court in Murphy . See Murphy , 188 Wis. 2d at 518. All subsequent references to the Wisconsin Statutes are to the 2015-16 version unless otherwise noted.

The evidence linking the gun to both crimes ultimately was not used at Malone's trial.

The dissent states: "The majority agrees that the issue at trial 'was whether Malone was the second robber.' Majority, ¶ 7." Dissent, ¶ 72. Like Detective David Feyen's selective choice of footage for the 7-Eleven "montage" video (discussed more later), which the dissent understandably questions, the dissent too is selective in what it represents as the majority's statement here. As seen above, we stated: "The issue at trial was whether Malone was the second robber in the Citgo robbery/felony murder on January 13," with "Citgo" italicized.

A montage is "a style of film editing in which contrasting shots or sequences are juxtaposed for the purpose of suggesting a total idea or impression." Montage , Webster's Third New International Dictionary (1993).

The prosecutor then asked Shakendra if she (the prosecutor) correctly read a portion of the statement related to what Thomas was wearing when he left the apartment "with the bald guy"; that Thomas and "the bald guy" went into Thomas' bedroom when they returned to the apartment; "[t]he bald guy had a lot of money with him"; and the "bald guy looked worried like he had something on his mind." The court sustained an objection to the prosecutor's question as to whether the prosecutor properly read this portion of the statement. It did so because Shakendra had previously indicated she could not read the statement and thus whether the prosecutor "read" that portion of the statement correctly "is really not a question that this witness is competent to answer based on the testimony so far." On appeal, the parties treat this questioning by the State as if it was evidence properly received. Because the court sustained this objection, however, we will not consider it. If we did, it would further support Malone's conviction.

An argument also could have been made to the trial court that the 7-Eleven robbery evidence was admissible for the proper purpose of showing Malone's knowledge-that Malone aided Thomas in the armed robbery of the Citgo with the knowledge that Thomas intended to commit that crime "by use or threat of use of a dangerous weapon." See Wis JI-Criminal 1032.

The State correctly points out that, in his appellate briefing, Malone "does not argue that the circuit court erroneously exercised its discretion; he argues relevance as though it were a matter for this Court to decide in the first instance."

Malone develops no argument that the probative value of the 7-Eleven robbery evidence was substantially outweighed by the danger of unfair prejudice, confusion, or misleading the jury; thus, we do not address that prong of the State v. Sullivan , 216 Wis. 2d 768, 789, 576 N.W.2d 30 (1998), analysis.

Malone also claims his trial counsel performed ineffectively by failing to introduce this additional video footage at the other acts motion hearing. We note that at the hearing on Malone's postconviction motion the trial court stated in relation to this failure:
I would say definitively and affirmatively from this Court's perspective having reviewed those exhibits before addressing this motion today and again watching the clip in court today and listening to the direct and cross examination questions of [Malone's trial counsel], the existence or nonexistence of that particular aspect of the evidence at the motion hearing on other acts evidence would have had absolutely no impact on this Court whatsoever.
To succeed on his ineffective assistance of counsel claim, Malone would have to demonstrate that trial counsel both performed deficiently in failing to present this additional video footage at the other acts hearing and that Malone was prejudiced by this failure. See Strickland v. Washington , 466 U.S. 668, 687 (1984). Perhaps because of the trial court's strong and direct statement related to this issue, Malone fails to develop an argument that he was prejudiced by counsel's failure to introduce the additional video footage at the motion hearing. Whatever the reason for failing to develop a prejudice argument, without such an argument, Malone cannot prevail on this claim.

After reviewing the additional video footage, the trial court noted that the 7-Eleven robbery occurred "during hours of darkness," yet "[t]he video in question appears even brighter than normal daylight." The court added: "I would agree that you can use different terminology, whether someone wants to use the terminology of distortion or otherwise.... I used the terminology in my own notes when I watched it was washed out."

Thomas testified that he is 5'3" tall. Exhibit 20 indicates he is 5'4" tall. Exhibits 12 and 19 indicate Malone is 5'9" and 5'11" tall, respectively.

The closest statement we could find toward such a contention is the following from Malone's reply brief: "Although the State is correct that Jerica Cotton identified one of the people in those images as Mr. Malone, he is not identifiable in the images themselves. Ms. Cotton's testimony that that was Mr. Malone is no different than her testimony that Mr. Malone accompanied her on the robbery."

Feyen also testified that the "taller male," who is bald, in these photos from the apartment building entryway was wearing a "white" shirt.

As indicated, Exhibit 5 was displayed for the jury. Bergin described in detail what was depicted in the photo.
This ... is the first shorter subject who first entered the store. This is the tan jacket, green Halloween mask, the Boston Celtics hat. That's the black glove he has on. That's the blue latex glove he has on. This is a handgun that he's holding. These are plaid pajama-style pants, red, gray, and black in color....
This subject in the background is the second suspect who entered the store, green Halloween mask, the plaid baseball style hat, dark colored jacket. You can see a white shirt underneath. Blue latex gloves, dark pants.
Observing Exhibit 5 along with Exhibit 10, the Citgo video footage, which shows the second robber best from nineteen minutes and thirty-seven seconds to nineteen minutes and forty-one seconds, the jury easily could have concluded that the skin of the second robber in the Citgo robbery was that of an African-American man. With such a conclusion, any suggestion by Malone that the second robber in the Citgo robbery must have been a Caucasian man because the second robber in the 7-Eleven robbery was, he argues, a Caucasian man (based upon the footage of the second robber's right hand appearing to be "white"), would have fallen flat.
Exhibit 10 provides a close-up view of the first, shorter robber-Thomas-and provides a view of not only the green Halloween mask he wore but of the skin of the neck and ear area that was not covered by the mask. This footage shows the skin to be dark in color, consistent with Thomas being African-American and consistent with his photo presented to the jury as Exhibit 20. Although the second robber shown in Exhibits 5 and 10 is in the background, the skin of the neck and ear area of this robber also appears to be visible and appears to be consistent with the skin color of African-American Malone as depicted in photo and video footage of Malone that was shown to the jury. Nothing about this apparent skin color of the second Citgo robber would give the jury reason to believe he was Caucasian.